**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2821-24

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

ANTHONY DELBRIDGE AND
JOEL LOPEZ,

    Defendants-Respondents.

_____

Argued November 17, 2025 – Decided April 2, 2026

Before Judges Natali, Walcott-Henderson, and Bergman.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 24-05-0656.

Josemiguel DeJesus Rodriguez, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Wayne Mello, Acting Hudson County Prosecutor, attorney; Jose DeJesus Rodriguez, of counsel and on the brief).

Stephan Van Jura, Assistant Deputy Public Defender, argued the cause for respondent Anthony Delbridge

(Jennifer N. Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Paul Condon argued the cause for respondent Joel Lopez (Paul Condon, attorney, joins in the brief of respondent Anthony Delbridge).

PER CURIAM

By leave granted, the State appeals from an April 3, 2025 order granting defendants Anthony Delbridge's and Joel Lopez's motions to suppress physical evidence – controlled dangerous substances (CDS), heroin, and a handgun – obtained during a stop of Lopez's car while Delbridge was a passenger. We conclude the actions of the police after properly arresting and removing Delbridge from the vehicle based upon an outstanding warrant were unreasonable, the "ultimate touchstone of the Fourth Amendment." Riley v. California, 573 U.S. 373, 381 (2014). We accordingly affirm the court's order suppressing the physical evidence seized in violation of Lopez's Fourth Amendment rights.

I.

Both defendants were indicted and charged with third-degree possession of a CDS, N.J.S.A. 2C:35-10(a)(1); third-degree possession of a controlled dangerous substance with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3); and second-degree possession of a controlled dangerous

substance with the intent to distribute within 500 feet of a public housing facility, park, or building, N.J.S.A. 2C:35-7.1(a). In addition, Lopez was charged with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); possession of a weapon while committing a crime, N.J.S.A. 2C:39-4.1(a); fourth-degree prohibited weapons and devices – large capacity ammo, N.J.S.A. 2C:39-3(j); and fourth-degree prohibited weapons and devices – firearms without a serial number, N.J.S.A. 2C:39-3(n).

We derive the following largely uncontested facts from the suppression hearing record where the State presented a single witness, Jersey City Police Officer Jonathan Romanella.[1] Officer Romanella stated he and Officer Joaquin Rodriguez were in plain clothes and in an unmarked cruiser outside a home on 23 Woodlawn Avenue, where Delbridge once lived, looking for him because he had an outstanding warrant for attempted murder and weapons offenses.

While watching the home, Officer Romanella observed an individual enter the residence and exit it "after a short time." He then noticed the man walk past him with a small white object in his hand which, consistent with his training and experience, he believed was heroin based on the manner in which it was

_____

[1] The officer's surname is spelled differently in the transcript of the evidentiary hearing and the court's written opinion. We employ the surname in the official court transcript.

A-2821-24

packaged. Officer Romanella stated he did not detain the individual because he did not want to "foil the investigation of trying to locate [] Delbridge."

Officer Romanella then observed another individual leaving the home. The officers followed him in their vehicle and, as they got closer, recognized the individual as Delbridge, and observed him enter the passenger side of a parked car on Woodlawn Avenue.

After calling for backup, the officers approached the parked car and blocked it with their vehicle to prevent it from leaving. The officers then exited their police cruiser and pointed their handguns at both occupants of the car—Delbridge and the driver, later identified as Lopez—and told them, "don't fu**ing move." Officer Romanella acknowledged that at this point neither occupant would have felt free to leave.

Officers ordered both defendants to show their hands, then ordered Delbridge out of the vehicle. Delbridge exited and officers shut the passenger door behind him, leaving Lopez in the car with a small child who was sitting in the backseat. After Officer Rodriguez confirmed Delbridge's identity, he was handcuffed, and during a search incident to his arrest, officers recovered a rubber band from his rear pants pocket.

A-2821-24

Officer Romanella then re-opened the passenger door and asked for and obtained Lopez's identification before closing the door again. He then walked away from the vehicle, entered the unmarked cruiser, and moved the cruiser to the side so that it no longer blocked Lopez's vehicle. After moving the vehicle, Officer Romanella returned to Lopez's vehicle and stated to the other officers, "let me check this area," before opening the passenger door again.

Officer Romanella then opened the passenger door and told Lopez "I'm gonna [sic] check this immediate area," while gesturing to the passenger's seat and floor. Officer Romanella testified he then decided to ask Lopez whether Delbridge left anything in the car based upon the presence of the single rubber band in Delbridge's pocket, which he had associated with drug use. In response, Lopez reached into the small area between the driver seat and the center console, retrieved six glassine bags and placed them on the passenger seat.

Officer Romanella then instructed Lopez to exit the vehicle and walked with him to the unmarked cruiser. Lopez told the officer he was not in possession of any CDS, but in response to further questioning, confirmed he had a gun in his jacket. Officer Romanella immediately handcuffed Lopez and placed him under arrest while a different officer on the scene seized the gun from inside Lopez's jacket pocket.

Officer Romanella acknowledged that he was unaware if 23 Woodlawn Avenue was a two-family home, that he did not have probable cause to arrest either Delbridge or Lopez for any drug related offense, that he did not view any furtive or suspicious activity between Lopez or Delbridge, and did not observe them passing anything to each other while in the car. Finally, Officer Romanella admitted that after he obtained Lopez's identification, he "walk[ed] around [with] it for a while," which further prevented Lopez from leaving the scene.

The court determined the police did not possess probable cause to either arrest or search Lopez and nothing in the record established he or Delbridge were involved in a drug transaction at 23 Woodlawn Avenue or otherwise. The court also found that neither Officer Romanella's earlier observations before confronting Delbridge and Lopez, nor the seizure of the single small rubber band from Delbridge's pocket, was sufficient to link Lopez to any criminal conduct. It further concluded the officers' conduct rose to the level of an arrest when they: (1) blocked Lopez's car with their police cruiser and (2) pointed their guns and yelled, "don't fu**ing move." As the court explained:

> [t]he officers possessed no legitimate observed or corroborated information to justify such an arrest. They had no knowledge of drugs, firearms, ammunition, or suspicious behavior on Lopez's part – only that he was the operator of the vehicle in which Delbridge entered.

6

The court determined that even assuming that the officers were permitted to temporarily detain Lopez to extract Delbridge and engage in an investigatory stop, there was no justification for detaining Lopez after he provided his driving credentials. The court found that while the officers had a right to check Lopez's identification, the officers "continued to hold" Lopez's license and "made no efforts to allow him to leave." Instead, the officers "extended the detention" by taking additional steps to investigate suspected CDS activity. The court concluded that Lopez's detention should have ended when he presented his identification and that the police's subsequent actions were therefore unwarranted.

Before the trial court, the State argued that in opening the passenger door and beginning to search, Officer Romanella conducted a valid search incident to Delbridge's arrest. The State tacitly reprises this argument before us but primarily argues that, because Lopez was detained only for a brief time and not subject to overly invasive treatment, his detention did not exceed constitutional bounds.[2] Defendants counter that the purpose of the stop was to arrest Delbridge

---

[2] The State also spends significant time arguing that Lopez was not in custody for the purposes of Miranda v. Arizona, 384 U.S. 436 (1966). Because our reading indicates that order on appeal did not resolve any Miranda motions, we do not address the issue.

and once that purpose was accomplished, the police could not detain Lopez, no matter how briefly, without violating constitutional bounds.

## II.

We begin our analysis by reciting the appropriate standard of review, followed by the applicable substantive constitutional legal principles that inform and guide our analysis. Our review of a trial court's decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We will defer to the trial court's factual findings so long as they are supported by sufficient evidence in the record, setting them aside only when "clearly mistaken." State v. Caneiro, 262 N.J. 288, 300 (2025). The trial court's legal interpretations, however, are reviewed de novo. Ibid.

Both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "guarantee individuals the right to be free from unreasonable searches and seizures." State v. Carter, 247 N.J. 488, 524 (2021). In recognition of that right, warrantless searches and seizures are held to be presumptively invalid. State v. Rosario, 229 N.J. 263, 271 (2017) (citing State v. Elders, 192 N.J. 224, 246 (2007)).

However, "[n]ot all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement." Rosario, 229 N.J. at 271

(quoting State v. Rodriguez, 172 N.J. 117, 125 (2002)). A field inquiry, for example, is "essentially a voluntary encounter," in which an individual is not compelled to answer, or even listen to, police questions. Ibid. Such encounters need not be proceeded by any "particular suspicion of criminal activity," but are valid only if the defendant, "under all of the attendant circumstances, reasonably believed he could walk away without answering." Id. at 272 (first quoting Elders, 192 N.J. at 246; and then quoting State v. Maryland, 167 N.J. 471, 483 (2001)).

In contrast, an investigative detention or "Terry stop," is a "temporary seizure" that occurs when "'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" Ibid. (quoting Rodriguez, 172 N.J. at 126). Such stops must be "brief and narrowly circumscribed" and the "intrusion on the individual [must be] minimal." State v. Dickey, 152 N.J. 468, 477 (1998). They must last no longer and be no more intrusive than necessary to effectuate "the purpose that justified the stop in the first place." State v. Shaw, 237 N.J. 588, 612 (2019). Provided these criteria are met, police may conduct an investigative detention based on objectively "reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in,

criminal activity." Rosario, 229 N.J. at 263 (quoting State v. Stovall, 170 N.J. 346, 356 (2002)).

When a seizure of a person strays beyond these bounds, an arrest occurs. Shaw, 237 N.J. at 612. An arrest "requires probable cause and generally is supported by an arrest warrant or by demonstration of grounds that would have justified one." Rosario, 229 N.J. at 272.

Whatever the relevant constitutional standard, "the detention must be reasonable both at its inception and throughout its entire execution." Shaw, 237 N.J. at 612 (quoting State v. Coles, 218 N.J. 322, 344 (2014)). In the case of a warrantless search, in order to overcome the presumption of invalidity, "the State must show by a preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement." Caneiro, 262 N.J. at 300-01 (quoting State v. Smart, 253 N.J. 156, 164 (2023)). Moreover, in the case of multiple entries or searches, each must be separately justified; lawful entry into a space does not guarantee that subsequent entries will also be lawful. Arizona v. Hicks, 480 U.S. 321, 324-25 (1987); United States v. Williams, 930 F.3d 44, 53-54 (2d Cir. 2019) (requiring discrete justification for each of two consecutive automobile searches). If these requirements are not met, statements

and evidence obtained as a result are subject to suppression. Caneiro, 262 N.J. at 300-01.

A conventional motor vehicle stop constitutes a seizure and therefore must be supported by at least reasonable, particularized suspicion of an offense. Carter, 247 N.J. at 524. Our courts have held that, under certain circumstances, approaching a parked vehicle and requesting the occupant's identification may also constitute an investigative detention. See Rosario, 229 N.J. at 273 ("It defies typical human experience to believe that one who is ordered to produce identification in such circumstances would feel free to leave."); see also State v. Boston, 469 N.J. Super. 223, 249-56 (App. Div. 2021) (surveying cases). However, a stop that begins as an investigative detention may mature into a "de facto arrest" if it is longer or more intrusive than necessary to effectuate its purpose. Shaw, 237 N.J. at 612. Once a stop has exceeded the "narrow" bounds of an investigative detention, by either duration, intrusiveness, or both, it "must be supported by probable cause." Dickey, 152 N.J. at 478.

Of course, a valid vehicle stop does not automatically confer on officers the right to conduct a warrantless search of the vehicle. State v. Witt, 223 N.J. 409, 450 (2015) (outlining the criteria for the "automobile exception" to the warrant requirement). Nor does the arrest of one of the vehicle occupants. In

State v. Cohen, 73 N.J. 331, 335 (1977), police arrested one occupant of a van, believing him to have an outstanding bench warrant for a CDS offense. The officers then opened the door to the van where the driver had remained. Id. at 344. Observing that at that point, the arrest "was complete" and "[n]o reason existed to suspect or implicate [the driver] in any precedent or current offense," the Court held "there was no justifiable reason or probable cause for the officers to make the initial intrusion by opening or compelling the occupant to open the van doors." Ibid. In State v. Lark, 163 N.J. 294, 296-97 (2000), the Court held that although the driver of vehicle had been validly arrested, police were not permitted search or impound the vehicle because the vehicle owner, who presented a valid license and "was not under suspicion," was present to take possession of the vehicle.

III.

Applying these principles, we affirm the trial court's order suppressing the physical evidence recovered from Lopez and his vehicle for two separate reasons. First, by reopening the passenger door in order to conduct a search after Delbridge had been removed and secured at the rear of the car, Officer Romanella conducted an unjustified warrantless search. Second, by the time Officer Romanella asked Lopez whether Delbridge had left anything in the

vehicle, the stop had exceeded the permissible length and scope of an investigative stop and lacked the probable cause necessary to support continuing detention. We address each of these constitutional violations in turn as they independently support the suppression order.

Although one's expectation of privacy in an automobile on a public street may be somewhat lessened in comparison to, say, a home, "it remains the law that motor vehicles constitute areas of privacy of persons and effects within the general protection of the Fourth Amendment and our own Constitution." State v. Woodson, 236 N.J. Super. 537, 539 (App. Div. 1989); accord State v. Eckel, 185 N.J. 523, 539 (2006). As we have held, "[t]here can be no dispute" that when officers suddenly and unilaterally open the door of a car, it "constitute[s] a warrantless search." State v. Gray, 474 N.J. Super. 216, 225 (App. Div. 2022) (citing Woodson, 236 N.J. Super. at 541). Such an action must therefore be taken pursuant to a warrant or otherwise justified by an exception to the warrant requirement. Ibid.; Cohen, 73 N.J. at 344.

Before the trial court, the State's sole justification for the officer's reopening the passenger door was to conduct a "search incident to [Delbridge's] arrest." The State argued that "[i]n New York v. Belton, 435 U.S. 454, 460 (1981), the United States Supreme Court established a bright-line rule that . . .

the lawful arrest of a motor vehicle occupant authorized the warrantless search of the passenger compartment" and "New Jersey courts have adopted the rule set forth in Belton." We view the State's position to be a significant misreading of our state's constitutional jurisprudence.

In Eckel, 185 N.J. at 541, our Supreme Court reaffirmed its long-standing decision to "decline to adopt Belton and its progeny because to do so would require us to accept a theoretically rootless doctrine that would erode the rights guaranteed to our own citizens." See State v. Pierce, 136 N.J. 184, 211 (1994) (rejecting "Belton's automatic [authorization of] vehicular searches following all arrests for motor-vehicle offenses"). Federal courts too have come to reject the "bright-line rule." Arizona v. Gant, 556 U.S. 332, 335 (2009) ("[W]e hold that Belton does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.").

Before us on appeal, the State does not identify any other exception to the warrant requirement that would justify reopening the passenger door and searching the area around the seat. Rather, relying on State v. Mai, 202 N.J. 12 (2010), the State makes the expansive argument that because officers were licensed to order Delbridge out of the vehicle, Officer Romanella's choice to

reopen the passenger door thereafter was of no moment. The State separately asserts that "no meaningful difference existed between reopening the front-passenger door . . . for the sole purpose of [asking whether Delbridge] left items behind, and posing the same question through the rolled-down drivers-side window." We disagree.

It is well established that a search incident to a lawful arrest is among the exceptions to the warrant requirement. State v. Torres, 253 N.J. 485, 503 (2023). But this exception is not without limit. In the case of a search conducted around the time of arrest, the purpose of the search must be "to remove from the arrestee's reach things that might be used to assault an officer or effect an escape as well as to prevent the destruction of evidence of the crime for which the individual has been arrested." State v. Dangerfield, 171 N.J. 446, 461 (2002). Thus, "[t]he scope of that search is restricted to the person of the arrestee and the area within his or her immediate control, meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" Ibid. (quoting Chimel v. California, 395 U.S. 752, 762-63 (1969)). Put another way, a search incident to arrest is confined to "the person of an arrestee and the area within his or her immediate control" at the time of the search. Ibid.

15                                                                          A-2821-24

In New Jersey, police may not search a vehicle incident to the arrest of an occupant if "the occupant of a vehicle has been arrested, removed and secured elsewhere" and effectively lacks the capacity to injure police or destroy evidence. Eckel, 185 N.J. at 540-41 ("To us, a warrantless search of an automobile based not on probable cause but solely on the arrest of a person unable to endanger the police or destroy evidence cannot be justified under any exception to the warrant requirement and is unreasonable."). If the arrestee has not been "removed and secured," courts must determine "on a case-by-case basis whether he or she was in a position to compromise police safety or to carry out the destruction of evidence," such that the particular search at issue was justified. Id. at 541. Significantly, an arrestee need not be subject to any particular conditions—e.g., placement in a police car or removal from the scene—to be considered sufficiently "removed and secured" or otherwise unable to compromise evidence or officer safety. See, e.g., State v. Carroll, 386 N.J. Super. 143, 156 (App. Div. 2006) ("[D]efendant was secured one car length away from the Buick after he was placed under arrest, and thus the car was not then within his immediate control.").

In this case, Officers Romanella and Rodriguez removed Delbridge through the passenger door. Rodriguez cuffed Delbridge while Officer

Romanella shut the car door before the two officers worked together to frisk Delbridge. Standing near the rear of the vehicle, Rodriguez began taking items out of Delbridge's pockets and placing them on the trunk. Officer Romanella reopened the passenger door and asked Delbridge if a phone on the passenger's seat belonged to him—he replied it did not. Officer Romanella then took Lopez's ID before closing the car door.

Officer Romanella then moved his unmarked vehicle, parking several car lengths down the street, before returning, by which point two more officers had arrived and were surrounding Delbridge where he stood, still cuffed, at the back of the car. Officer Romanella testified that the other officers had searched Delbridge and notified him that they had found a rubber band. Officer Romanella then decided to check the car again, walking back to the passenger door, saying to his fellow officers, "let me check this area." He opened the door again and, gesturing to the passenger seat, told Lopez, "I'm gonna [sic] check this immediate area," before resting his hand on the seat.

These facts show that, by the time Officer Romanella opened the car door for a third time to "check th[e] area," Delbridge was "arrested, removed, and secured" such that he could not have reached the passenger seat. Eckel, 185 N.J. at 540-41. Delbridge was cuffed and the car door was closed. He had offered

17

no resistance nor attempted to flee and was surrounded by three officers in addition to Officer Romanella. Officer Romanella agreed that, at the time he reopened the passenger door, he thought Delbridge "wasn't a threat to anyone" and he was "not concerned" about him trying to destroy evidence.

In light of these facts, we cannot conclude that the passenger seat or its surrounding area was "within his immediate control," nor can we reasonably foresee how he would "gain possession of a weapon or destructible evidence" therefrom. Dangerfield, 171 N.J. at 461. Because Delbridge was undisputedly secured at the rear of the vehicle, the police were not permitted to conduct a search of the passenger compartment incident to his arrest.

We are not persuaded by the State's arguments to the contrary. First, the fact that the officers were permitted to open the door to remove Delbridge does not establish that they were permitted to reopen the door thereafter. Hicks, 480 U.S. at 324-25 (explaining that each discrete search and seizure must be justified); Eckel, 185 N.J. at 541 (reaffirming that arresting an occupant of a vehicle does not automatically permit the vehicle to be searched). Mai, 202 N.J. at 12, on which the State relies, does not hold to the contrary. In that case, officers responding to a call under dangerous circumstances approached a van. Id. at 14-15. The Court determined that the same "heightened" safety risk that

18                                                                    A-2821-24

permitted the officers to order the passengers out of the van also permitted the officers to open the van door before the passengers exited so that they could accomplish the task more safely. Id. at 14-15, 21-23. In so doing, the Court discerned no meaningful difference between "the grant of authority to order an occupant of a vehicle to exit the vehicle and the authority to open the door as part of issuing that lawful order." Id. at 22-23. Thus, Mai only granted the authority to open a car door "as part of" a lawful effort to remove a vehicle's occupant; it does not extend to an officer's subsequent reentry into a vehicle to conduct an investigatory search.

Second, the State cites no authority for its alternative assertion that speaking to a driver through the driver's window is the same as opening the passenger door to do so. Nor can it. Speaking through an open window involves no physical intrusion that might run afoul of constitutional safeguards. Cf. Texas v. Brown, 460 U.S. 730, 739-40 (1983) (explaining that looking into a vehicle from outside "trenched upon no right secured . . . by the Fourth Amendment"). Conversely, opening a car door involves a physical intrusion. Cohen, 73 N.J. at 344 (explaining that opening or directing an occupant to open a door was an "intrusion" requiring justification); Gray, 474 N.J. Super. at 223 ("Opening the [car] door sufficiently partakes of an 'exploratory investigation'

19

as to constitute a search."). Indeed, the difference is demonstrated in this case, where Officer Romanella's stated intent in opening the door was to perform a search, not merely to speak to Lopez. The State's attempt to minimize the intrusion is contrary to our case law and unavailing.

We briefly address two other exceptions to the warrant requirement that are often invoked in vehicle-search cases but that that State has not chosen to advance in this case. We deem this failure to be significant and not inconsequential as our Supreme Court has instructed, "the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review." Witt, 223 N.J. at 419. We discuss each exception solely for completeness and to amplify the State's failure to raise either exception both in the trial court or before us.

First, the automobile exception, which permits warrantless searches "only when the police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous." Id. at 447. Again, the State never argued that either prong exists in this case where officers were surveilling and pursuing Delbridge based on an existing warrant and had no indication that Lopez's vehicle might be connected to Delbridge's offense. As courts have long

20

held, probable cause to arrest a person and probable cause to search a place entail different analyses. State v. Boone, 232 N.J. 417, 430 (2017); see also Steagald v. United States, 451 U.S. 204, 205, 216 (1981) (pursuing an arrestee into a third-party's home violated the third-party's rights); State v. Welsh, 84 N.J. 346, 353 (1980) ("The presence of an eight day-old arrest warrant does not alone provide probable cause to search the automobile of the arrestee.").

Second, the protective sweep doctrine allows "[a]n officer lawfully stopping a vehicle may conduct a protective frisk of the passenger compartment if he has a reasonable suspicion that the individual is dangerous and may gain immediate access to weapons." State v. Gamble, 218 N.J. 412, 431-32 (2014). Such searches are not designed to seek evidence, but rather to ameliorate "risk[s] to officer and public safety" and therefore must be "cursory and limited in scope to the location where the danger may be concealed." Id. at 433. Determining whether grounds for such a "sweep" exist is "a fact-sensitive inquiry," that incorporates "the context of the officer's relative experience and knowledge." State v. Robinson, 228 N.J. 529, 547 (2017). Thus, while an officer's subjective belief is not generally dispositive in evaluating the propriety of a search, State v. Bacome, 228 N.J. 94, 103 (2017), we find Officer Romanella's testimony and in-the-field actions instructive here. Officer Romanella testified that, when he

21

approached the car to search it, Delbridge had been removed. He also testified that he had no reason to believe Lopez would be armed or dangerous and the record reveals no furtive or unsettling behavior. This is consistent with officers' choice to leave Lopez alone in the vehicle for several minutes, returning to conduct a search only after finding the rubber band on Delbridge, which was the animating reason he entered the vehicle. Further, at no point in these proceedings did the State ever argue that Officer Romanella's subjective belief was incorrect.

We add these remarks to underscore that our decision, like, presumably, the State's selection of what arguments to make and not make, is dictated by the record before us. Cf. State v. Terry, 232 N.J. 218, 252 (2018) (Rabner, C.J., dissenting) (observing that "[b]ecause the police lacked probable cause" and "could not make [the] showing" to support a protective sweep, "the State [did] not rely on" either exception). On these facts and arguments, we find that, by reopening the passenger door, Officer Romanella conducted an unwarranted search of Lopez's vehicle and that the State has not demonstrated that any exception to the warrant requirement applied.

IV.

This violation would be sufficient reason to affirm the trial court's grant of suppression. In the interest of completeness, we also address the investigatory stop of Lopez and, because we find that it exceeded permissible constitutional limits, find that it provides an alternate basis for suppression.

As noted, investigative detentions based on reasonable suspicion constitute a narrowly circumscribed exception to the general rule that authorities may only seize a person based on probable cause. Dickey, 152 N.J. at 477. There is no simple, easily reducible test to determine when a detention has strayed into impermissible territory, but "important factors include unnecessary delays, handcuffing the suspect, confining the suspect in a police car, transporting the suspect, isolating the suspect, and the degree of fear and humiliation engendered by the police conduct." Shaw, 237 N.J. at 612-13.

Viewed in light of all relevant circumstances, a permissible investigative stop must be no longer or more intrusive than necessary to effectuate the initial purpose of the stop, and officers should "act diligently to minimize" the length of the detention. Dickey, 152 N.J. at 478, 481. Thus, police may neither extend the stop after its objective is complete, nor delay completing that objective, in

order to conduct an investigation.  Rodriguez v. United States, 575 U.S. 348, 357 (2015).

We begin by establishing the bounds of our analysis.  First, the parties appear to agree that when Officer Romanella and his partner pulled their vehicle alongside Lopez's parked car, exited, drew their weapons, and ordered the occupants not to move, Lopez was seized.  We agree since, self-evidently, an "objectively reasonable person would feel that his or her right to move has been restricted" under these circumstances.  Rosario, 229 N.J. at 272.  We next find that Officer Romanella continued that seizure by taking and holding Lopez's driver's license, without which Lopez would not have felt free to leave the area, particularly by car.

The parties also appear to agree that the initial seizure was authorized solely by the warrant for Delbridge's arrest on attempted murder and related charges.  Thus, the question for our purposes is whether the officers detained Lopez longer than was necessary to facilitate Delbridge's arrest.

The State frames the issue differently, arguing that "because a valid arrest warrant for attempted murder can give rise to reasonable suspicion that the person named in the warrant committed a crime . . . officers were entitled to conduct an investigative stop that was no more intrusive than necessary to gather

information on their attempted-murder suspect." We believe this misarticulates both the record and the governing legal standard. A <u>Terry</u> stop must be no more intrusive than necessary to achieve "the purpose that justified the stop in the first place." <u>Shaw</u>, 237 N.J. at 612; <u>see also</u> <u>Rodriguez</u>, 575 U.S. at 348-49 (explaining that a stop's "tolerable duration is determined by the seizure's mission"). Here, Officer Romanella testified and the State acknowledges that the purpose and justification for the stop was to execute an arrest warrant. That is the purpose that establishes its constitutional bounds.

In concluding that effectuating the arrest, not investigating the arrestee and the car he had recently entered, was the permissible scope of the stop, we consider it instructive that in cases where officers initiate a truly investigatory stop based on reasonable suspicion that a crime has occurred, the stop must last no longer than necessary "to confirm or dispel" that suspicion. <u>Dickey</u>, 152 N.J. at 477. The desire to gather information beyond that purpose cannot justify a stop, especially of a third party. <u>State v. Alessi</u>, 240 N.J. 501, 523 (2020) ("A law enforcement officer cannot use an automobile stop merely for the purpose of a police interview."). In a case where an arrest warrant has been issued, any suspicion has already escalated to the level of probable cause, <u>State v. Brown</u>, 205 N.J. 133, 144 (2011), leaving no room for further information gathering.

25

Having established the bounds of our inquiry, we next review several factors relevant to our analysis. First, an investigatory stop is not automatically rendered unconstitutional because an officer has asked questions—even questions unrelated to the initial purpose of the stop—during its pendency. Officers may ask questions about matters unrelated to the initial stop "so long as such questioning does not extend" the stop. State v. Hickman, 335 N.J. Super. 623, 636 (App. Div. 2000); see also Arizona v. Johnson, 555 U.S. 323, 334 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). Our Supreme Court and the United States Supreme Court alike have emphasized that these "incidental" inquiries cannot add to the time the stop would otherwise take "absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" State v. Dunbar, 229 N.J. 521, 533-34 (2017) (quoting Rodriguez, 575 U.S. at 355).

For example, in Hickman, 335 N.J. Super. at 628, 635, officers pulled over a vehicle and discovered that none of the three occupants were licensed drivers. Because no one could legally drive the vehicle from the scene, officers

had an "objectively reasonable basis" and, indeed, little choice but "to detain the car and its occupants" at the roadside. Ibid. Before the issue could be resolved and the stop completed, an officer noticed that one of the passengers appeared "nervous", "refused to make eye contact", and "shifted his weight from one side to another," prompting the officer to ask if the passenger possessed a weapon or contraband. Id. at 628. In response, the passenger confessed that he had a small bag of CDS. Ibid. The questioning, however, did not make the stop last any longer than it would have had the officers been silent throughout; thus, no probable cause was required. Id. at 635; see also State v. Pegeese, 351 N.J. Super. 25, 32 (App. Div. 2002) (approving of questions asked while an officer awaited a vehicle status check being performed by another officer).

A question, however, even one which might be permissible under other circumstances, is not permissible if it extends a stop beyond its constitutional limits. For example, "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 185 (2004). Indeed, a lawfully stopped driver may be required to display a valid license. N.J.S.A. 39:3-29. Yet even such anodyne inquiries have been found to unconstitutionally extend a stop. See, e.g., State v. Williams, 254 N.J. 8, 41 (2023) (holding that police were

required to terminate a mistaken traffic stop rather than continuing to check the driver's credentials); United States v. Landeros, 913 F.3d 862 (9th Cir. 2019) (demanding a passenger's identification unnecessarily extended the stop); cf. United States v. Clark, 902 F.3d 404, 406-08 (3d Cir. 2018) (questioning of vehicle occupants on various topics).

In such cases, it is the context, not the content, of the question that matters. An officer may ask additional questions if he does so during the normal pendency of the stop. If those constitutionally permissible questions yield new suspicions, an officer may "broaden the scope of his inquiry." Hickman, 335 N.J. Super. at 637. However, if the initial question increased the length of the stop, it was not permissible, nor was any detention that occurred thereafter. Dickey, 152 N.J. at 482.

Second, neither an extension nor the stop as a whole must be lengthy to violate the applicable constitutional principles. In Williams, 254 N.J. at 18, for example, a police officer stopped a car because its registered owner, a woman, had a suspended license, only to realize that the car was occupied by two men. The officer nonetheless took the driver's credentials and called for a drug sniffing dog. Id. at 18-19. Although the stop was extended by "only a few minutes" - three minutes for the credentials request, five additional minutes for

the dog to arrive—the Court held that was too much and the occupants "should have been already permitted to leave." Id. at 19, 45. In Landeros, 913 F.3d at 867, officers spent "several minutes of additional questioning" to ascertain the identity of a passenger during a vehicle stop. The court, applying Rodriguez, 575 U.S. 348, held that even this extension was impermissible since it exceeded the narrow confines of the investigative detention. Landeros, 913 F.3d at 868. In Clark, 902 F.3d at 401, 401 n.4, 411, the court emphasized that "[t]here is no de minimis exception" to Rodriguez and held that twenty seconds of additional questioning unconstitutionally extended a stop. See also United States v. Campbell, 26 F.4th 860, 885 (11th Cir. 2022) (en banc) (finding an extension of "approximately twenty-five seconds" unconstitutional).

Similarly, in Rodriguez, 575 U.S. at 353, the Court dealt with an eight-minute extension resulting in a stop lasting no more than half an hour. The court dismissed the notion that an "incremental[ly]" prolonged stop is permissible so long as "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." The Court explained that the relevant question was not whether the length of the stop was of a piece with other similar stops but rather "what the police in fact do" in a given case. Id. at 357. Thus, any additions not necessary to effectuate the stop's

29

"mission" violate the constitution, regardless of the net length of the encounter. Ibid.

Third, while much of the caselaw surrounding investigative detention developed from cases involving motor vehicle stop, the principles are of general applicability. Terry v. Ohio, 392 U.S. 1, 4, 17-18 (1968), from which the concept of the limited-scope investigative detention derives, concerned "confrontation[s] on the street between the citizen and the policeman investigating suspicious circumstances." Our Supreme Court has continued to apply the doctrine to street encounters. In State v. Legette, 227 N.J. 460, 463, 473 (2017), for example, the Court held an initially valid street stop by officers investigating a noise complaint exceeded the "narrowly drawn" limits of Terry when they followed the suspect into his apartment to retrieve identification. The Court held that the officers thereby failed to use "the least intrusive means reasonably available" to investigate, contrary to the limited authorization of an investigative detention. Id. at 473.

In State v. Coles, 218 N.J. 322, 327, 344 (2014), the Court held that police who stopped a burglary suspect on the street could detain him long enough to conduct a showup identification but could not continue the detention in an effort to search his home once the showup failed to identify him. In reaching this

conclusion, the Court reiterated that a detention "must be reasonable both at its inception and throughout its entire execution," must "use the least intrusive means" and "last no longer than is necessary" to effectuate the purpose of the detention, and that police must "diligently pursue[]" those means. Id. at 344.

In Shaw, the Court applied the same rules to an investigative detention that, as in this case, only nominally involved a vehicle. 237 N.J. at 598-99. As police were pursuing a suspected drug dealer, they located the suspect's vehicle as she pulled into the parking lot of the hotel at which she was staying. Ibid. The suspect was arrested, handcuffed, and placed in the back of a patrol car. Id. at 599. The officers also removed Shaw, a passenger, and performed a warrant check, which yielded no results. Id. at 600. Nonetheless, officers detained Shaw at the scene while a dog sniff was performed, during which time Shaw revealed incriminating information. Ibid. The Court held that Shaw's "mere presence in the car of a suspected drug dealer" was no basis to detain him and thus concluded "there was no particularized suspicion that Shaw was engaged in criminal activity that would justify Shaw's further detention." Id. at 613. In sum, the same analysis applies even where police are investigating offenses significantly more serious than garden-variety traffic violations.

Against this legal backdrop, we begin our analysis of this case by noting that police had no independent basis to stop Lopez beyond his proximity to Delbridge. Lopez was not suspected of committing any offenses, nor was he thought to be dangerous. Had the officers initiated the arrest a moment earlier, while Delbridge was walking, Lopez would never have been seized. Even so, it was necessary to temporarily seize him to allow officers to safely execute the warrant for Delbridge's arrest.

Delbridge was then quickly removed and secured. We cannot discern, and the State has not provided any reason that Lopez's continued detention was necessary to complete Delbridge's arrest, "the purpose that justified the stop in the first place." Shaw, 237 N.J. at 612. Tellingly, Officer Romanella appeared to share our impression. He testified that, after Delbridge was arrested and before Lopez turned over the suspected CDS, Lopez was "technically free to leave." This view is incongruous with the notion that Lopez's continued detention was "necessary."

For similar reasons, we are unpersuaded by the State's reliance on Hickman. Hickman, 335 N.J. Super. at 628, established that defendants may be questioned during a valid and ongoing stop; Lopez was questioned after the reason for his stop, and therefore its permissible duration, had concluded. As

32

we recognized in <u>Hickman</u>, 575 N.J. Super. at 636, even otherwise permissible police action, including questioning, violates the constitution if it "extend[s] the duration of the stop."  We apply that holding here.

Officer Romanella also acknowledged that, having previously told Lopez not to move, he did not tell him that he could leave.  In fact, he took his driver's license.  It is not clear from the record why he chose to do so.  The vehicle was parked when the stop began, meaning Lopez was not driving.  Moreover, despite taking the license with him when he returned to his own vehicle, Officer Romanella did not run a check or call the information in.  Instead, he "walk[ed] around with it for a while" while Lopez waited.  Despite Officer Romanella's testimony that he viewed Lopez as "technically free to leave," this behavior had the effect of tethering him to the scene, extending the initial stop.

On this record, we conclude that Lopez's continued presence at the scene was not necessary.  The officers did not suspect him of any offense, nor perceive him as dangerous.  Delbridge had been secured. Thus, his continued detention was without justification.

The State argues that the continued detention was permissible because it was short, Lopez was neither handcuffed nor removed from his vehicle, and

A-2821-24

"there [was] no indication of even minimal fear or humiliation."[3] We are unpersuaded.

First, as discussed, the length of a stop is not dispositive and even brief unconstitutional detentions are not permitted. Rodriguez, 575 U.S. at 535; Williams, 254 N.J. at 18. Where the purpose of a stop has been achieved, our courts have drawn a hard line. Ibid. Length is a more helpful factor in cases like Dickey, 152 N.J. at 477, where officers are pursuing an amorphous goal like the confirmation or denial of certain suspicions. In such cases, a stop can conceivably continue indefinitely without the initial objective having been achieved, requiring courts to weigh in on "how long is too long." The facts of this case do not require such an analysis. In this case, the initial purpose of the stop had been achieved, and Lopez's continued detention could not further that purpose. Thus, any further detention lacked constitutional support.

Likewise, the State is correct that Lopez did not suffer the intrusion of handcuffs or sequestration in a police car. On the other hand, as we have

---

[3] The State also asserts that Officer Romanella moved his vehicle to avoid blocking Lopez's. The relevance of this claim is not entirely clear, and, in any event, it is unsupported by the record. Officer Romanella testified that his vehicle was parked such that it blocked traffic on Woodlawn Ave and he moved it so that other cars could pass by, not so Lopez, whose license Officer Romanella was still holding, could drive away.

A-2821-24

discussed, Officer Romanella twice opened the passenger door—a search under our Constitution—after Delbridge had been arrested and secured. Thus, the officers "use[d] more intrusive means than necessary" to "effectuate the purpose" of the stop, to wit, the already-completed arrest of Delbridge. Shaw, 237 N.J. at 612. Moreover, as discussed, Officer Romanella "walk[ed] around with" Lopez's license for some time without calling in the license or checking its validity. We see two ways to interpret these actions. If Officer Romanella felt it necessary and prudent to check Lopez's identification and yet delayed, he did not "diligently pursue[]" the investigation such that it could conclude in a timely fashion, contrary to Dickey, 152 N.J. at 477, and Rodriguez, 575 U.S. 357. If Officer Romanella held Lopez's identification with no intention of checking it, his actions deepened the intrusion upon Lopez.

Finally, although Lopez did not testify so as to "indicate" his "fear or humiliation," we note again that this encounter began when officers pointed guns at Lopez's vehicle, yelling at him not to move. Unbeknownst to the officers, there was a young child in the back seat. We do not question the propriety of this approach, but we have no difficulty inferring that it induced some measure of fear.

In sum, we conclude that the officers in this case exceeded the authorized scope of the investigative stop. Lopez was detained longer than necessary because Delbridge had already been arrested. The detention was more intrusive yet less diligent than necessary because, among other things, Officer Romanella repeatedly opened his vehicle door and seized but did not run his license. <u>Terry</u> stops represent a strictly limited exception and the State has not demonstrated that it applied to Lopez's continued detention here.

Certainly, neither the length nor the conditions of the detention were particularly arduous. Under the appropriate circumstances, a short detention and a simple questioning would no doubt be permissible. But we are confined to the circumstances of this case. On these facts, Lopez's continued detention was impermissible. We hold that the trial court correctly suppressed the physical evidence recovered from Lopez and his vehicle.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2821-24